ESSENTIAL COMMUNICATION SYSTEMS, INC., Plaintiff,

v.

AMERICAN TELEPHONE & TELEGRAPH COMPANY, Western Electric Company, New Jersey Bell Telephone Company, Defendants.

Civ. A. No. 700–73.

United States District Court, D. New Jersey.

March 13, 1978.

David Berger, Berger & Montague, Philadelphia, Pa., for plaintiff.

forced and threatened to enforce those tariffs against persons who obtained "code-a-phones" from Essential even though such answering devices were, in all material respects, identical to those distributed by the defendants (because manufactured by the same company which supplied defendants) and even though some of the devices distributed by Essential had built-in PCA circuitry. It is also alleged that the defendants further restrained competition by the manner in which they enforced and threatened to enforce the tariffs, e. g., by providing Essential's customers with incorrect or malfunctioning PCA's, by unreasonable delay in providing PCA's, and by failing to adequately and properly train their service personnel in the installation and servicing of PCA's.[1]

Bernard M. Hartnett, Jr., Newark, N. J., for defendant New Jersey Bell Telephone Co.

Clyde A. Szuch, Pitney, Hardin & Kipp, Morristown, N. J., George L. Saunders, Jr., C. John Buresh, Sidley & Austin, Chicago, Ill., for defendants American Telephone & Telegraph Co. and Western Electric Co.

## OPINION

WHIPPLE, Chief Judge.

Essential Communications Systems distributes a device named "code-a-phone" which, when electronically connected to a telephone (and thereby with the telephone network) automatically answers, transfers and records incoming calls. American Telephone and Telegraph Company (ATT) and New Jersey Bell are part of the Bell System which owns and operates the telecommunications system. They are subject to regulation by the Federal Communications Commission (FCC) and state commissions such as the New Jersey Public Utility Commission (N.J.P.U.C.). Western Electric Company is a subsidiary of ATT which manufactures, *inter alia*, telephone equipment.

On May 17, 1973, Essential filed a complaint which alleged violations of Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2) by ATT, New Jersey Bell and Western Electric and requested injunctive relief, treble damages and attorney fees. Specifically, Essential alleged: That it and the defendants were in competition in the distribution of "code-a-phones"; That beginning January 1, 1969 the defendants sought to restrain competition in this market by the promulgation of tariffs with the regulatory agencies which prohibited connection to the telephone network of "code-a-phones" not obtained from defendants except through a protective connecting arrangement (hereafter: PCA) leased from the defendants; That the defendants en-

On October 5, 1973, by consent of the parties, this action was stayed so that the N.J.P.U.C. might exercise primary jurisdiction over the issue of the PCA tariffs. However, in early 1974, the FCC asserted an exclusive jurisdiction over the regulation of interconnection of customer-provided terminal equipment (hereafter: CPTE) which largely preempted state regulatory commissions. *In the Matter of Telerent Leasing*, 45 FCC 2d 204 (1974), *aff'd, sub nom. North Carolina Util. Com'n v. FCC*, 537 F.2d 787 (4th Cir. 1976); *cert. den.*, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976); *recon. den.*, 552 F.2d 1036 (4th Cir. 1977). On December 22, 1976, the Hearing Examiner of the N.J.P.U.C. issued an opinion responding to this Court's referral. The opinion stated, *inter alia*, that the N.J.P.U.C. lacked jurisdiction, under the *Telerant* decisions, *supra*, to determine the validity of the tariffs. On June 13, 1977, the stay was revoked and the action returned to the active docket.

On August 1, 1977, defendants filed a motion to dismiss this action due to an implied immunity[2] from the antitrust laws

---

1. These last allegations do not appear in the complaint. Instead, they were made for the first time in the plaintiff's Brief in Opposition to Defendants' Motion to Dismiss.

2. The defendants do not assert an express immunity under the Communications Act of 1934, 47 U.S.C. § 151, *et seq. Cf. Carnation Co. v. Pacific Westbound Conference*, 383 U.S. 213,

arising from the regulation by the FCC of the challenged activity. After consideration of the parties' oral argument and voluminous briefs, this Court is of the opinion that the motion should be granted for reasons that will appear below.

## I.

■ The doctrine of "implied immunity" is actually a subspecie of implied statutory repeal. *See, Gordon v. N. Y. Stock Exchange*, 422 U.S. 659, 682, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975), and *U. S. v. Southern Motor Carriers Rate Conference*, 439 F.Supp. 29, 35 (N.D.Georgia, 1977). It is one of several distinct judicially created rules, which include "primary jurisdiction" and "exhaustion of administrative remedies",[3] designed to resolve potential conflicts between two regimes with federal statutory authorization to regulate the conduct of business entities: federal administrative agencies and federal courts enforcing (among others) the antitrust laws.

The antitrust laws posit that the public interest is best served when business enterprises are compelled to compete in markets free of anti-competitive restraints. In contrast, the basic premise of administrative regulation is that the freedom of business entities must be in some degree curtailed to maximize the general welfare. When the same conduct falls within the scope of both the antitrust laws and a regulatory scheme, potential conflicts of competency and policy are resolved under the doctrine of implied immunity. Note: *AT&T and the Antitrust Laws: A Strict Test for Implied Immunity*, 85 Yale L.J. 254, 255–256 (1975). *See, Gordon v. N. Y. S. E., supra*, 422 U.S., at 689, 95 S.Ct. 2598; *Silver v. N. Y. Stock Exchange*, 373 U.S. 341, 349, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963); and *FCC v. RCA Communications, Inc.*, 346 U.S. 86, 91–92, 73 S.Ct. 998, 97 L.Ed. 1470 (1953).

The Supreme Court has articulated broad maxims on the implication of immunity from the antitrust laws due to administrative regulation. It has said:

Only where there is a "plain repugnancy between the antitrust and regulatory provisions" will repeal be implied. *United States v. Philadelphia National Bank*, 374 U.S. 321, 350–51, 83 S.Ct. 1715, 1734–35, 10 L.Ed.2d 915 (1963). [Citations omitted]

*Gordon, supra*, 422 U.S., at p. 682, 95 S.Ct., at p. 2611. Further, the Court noted in *Silver v. N. Y. S. E., supra*, 373 U.S., at p. 357, 83 S.Ct., at p. 1257.

[The] proper approach . . . is an analysis which reconciles the operation of both statutory schemes with one another rather than holding one completely ousted.

Thus, as a "guiding principle" the Court declared:

Repeal is to be regarded as implied only if necessary to make the [regulatory scheme] work, and even then only to the minimum extent necessary.

*Id. Accord: Gordon, supra*, 422 U.S. at p. 683, 95 S.Ct. 2598. Finally, the Court has warned that:

Activities which come under the jurisdiction of a regulatory agency nevertheless may be subject to scrutiny under the antitrust laws.

*Otter Tail Power Co. v. U. S.*, 410 U.S. 366, 372, 93 S.Ct. 1022, 1027, 35 L.Ed.2d 359 (1973).

■ While stated with clarity, these axioms have proved difficult to apply in particular cases. *See, Note: AT&T and the Antitrust Laws, supra*, at pp. 257–58. We, nevertheless, perceive a common analysis in the Supreme Court cases dealing with implied immunity or repeal. Under this analysis, immunity is implied only if two elements are found to exist.

First, there must be a conflict between the antitrust laws and the regulatory scheme regarding the *specific conduct at issue*. In other words, the policies and pur-

86 S.Ct. 781, 15 L.Ed.2d 709 (1966). Further, it is doubtful that they could successfully do so. *See, U. S. v. AT&T Co.*, 427 F.Supp. 57, 59

(D.D.C.1976); and Federal Communications Act of 1934, 47 U.S.C. §§ 221(a), 222(c)(1).
3. *See, U. S. v. Western Pacific R. Co.*, 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956).

poses of the regulatory scheme must be such that, in implementing those policies, the agency or enabling act would require, approve or sanction the specific conduct, or type of conduct, alleged to be in violation of the antitrust laws.

■ Thus, a necessary, but not sufficient, condition to this first element is that the agency have the power to regulate the conduct at issue. *See, Gordon, supra,* 422 U.S. at pp. 683–84, 95 S.Ct. 2598 (discussing *Silver, supra*); *Georgia v. Pennsylvania R. Co.,* 324 U.S. 439, 455–57 (1945); and *U. S. v. Southern Motor Carries Rate Conference, supra,* at p. 36. *Cf. Seatrain Lines, Inc. v. Pennsylvania R. Co. et al.,* 207 F.2d 255 (3d Cir. 1953). Further, to provide the requisite repugnancy, the conduct alleged to violate the antitrust law must be (or, perhaps, might be) required,[4] approved or sanctioned by the regulatory agency in implementation of the policies or purposes of its enabling act. The Court observed in *U. S. v. National Ass'n of Securities Dealers, et al.,* 422 U.S. 694, 734, 95 S.Ct. 2427, 2450, 45 L.Ed.2d 486 (1975):

> [W]e have implied immunity in particular and discrete instances to assure that the federal agency entrusted with regulation . . . could carry out that responsibility free from the *conflicting* judgments that might be voiced by courts exercising jurisdiction under the antitrust laws. (Emphasis added)

Similarly, in *Gordon, supra,* immunity was based, in part, upon a finding:

> [T]hat to deny antitrust immunity with respect to [the conduct at issue] would be to subject the [regulated entities] to *conflicting* standards.

422 U.S. at p. 689, 95 S.Ct. at p. 2614. (Emphasis added).

■ Thus, if the agency has considered the specific conduct and either denied it sanction or approval or declared it inconsistent with regulatory goals, any claim of

implied immunity as to that conduct must fail. In *Ricci v. Chicago Mercantile Exchange,* 409 U.S. 289, 93 S.Ct. 573, 34 L.Ed.2d 525 (1973), it was held that where conduct regulated by an agency is alleged to violate antitrust laws, the status of that conduct under the regulatory scheme should be referred to the agency under the doctrine of primary jurisdiction before the issue of immunity is determined. The rationale being that the:

> [agency's] determination will be of great help to the antitrust court in arriving at the essential accommodation between the antitrust and regulatory regimes: The problem disappears entirely if it is found that there has been a violation of the [agency's] rule . . . . .

409 U.S. at 307, 93 S.Ct. at 583. Similarly, in *Mt. Hood Stages, Inc. v. Greyhound Corp.,* 555 F.2d 687 (9th Cir. 1977), the denial of a claim of implied immunity was affirmed where the conduct found to have violated the antitrust laws had been disapproved by the relevant agency as contrary to the regulatory goals. The Court noted that under such circumstances:

> Clearly there has been no conflict between the regulatory and antitrust regimes. On the contrary, they have accommodated and supplemented each other. The policies of both have been advanced.

555 F.2d at p. 692.

■ Given the requisite repugnancy, it becomes necessary to address the second element: How did Congress intend that the conflict be resolved. Only if it be found that Congress intended that the regulatory scheme should prevail over the antitrust laws in the event of conflict will immunity or repeal be implied. As stated in *Otter Tail, supra,* 410 U.S., at p. 374, 93 S.Ct. at p. 1028, immunity should only be implied where a court may "conclude that Congress intended to override the fundamental na-

---

4. We need not decide, and accordingly do not address, whether a *potential* rather than an *existing* conflict is sufficient to provide the requisite repugnancy. *Compare, Otter Tail, supra,* 410 U.S. at pp. 376–77, 93 S.Ct. 1022 *with*

*Gordon, supra,* 422 U.S., pp. 690–91, 95 S.Ct. 2598 and *Carnation Co. v. Pacific Westbound Conference, supra,* 383 U.S., at pp. 220–21, 86 S.Ct. 781.

tional policies embodied in the antitrust laws." The Court in *Mt. Hood Stages, Inc., supra,* succinctly observed:

> Whether conduct Congress has made subject to administrative regulation is exempt from the antitrust laws depends upon Congress' intent.

555 F.2d at 691. As will be demonstrated below, the Supreme Court's analysis of the element of congressional intent has focused largely upon the form, scope and content of authority devolving to the agency and the regulated entity under the enabling act.

## II.

We now turn to the case at hand. The essence of Essential's claim is that the defendants violated the antitrust laws both in the promulgation and implementation of tariffs which required their subscribers who obtained "code-a-phones" from Essential to also lease a PCA from them.[5] However, the defendants respond that this conduct was exempt from antitrust sanctions because performed under the auspices of tariffs filed with the FCC. Plaintiff answers that no immunity can arise under those tariffs because they were declared unlawful by the FCC.

## A.

■ It is well established that the FCC has competency to regulate the inter-connection of customer-provided terminal equipment with the telephone network. *In the Matter of Telerent Leasing,* 45 FCC2d 204 (1974), *aff'd, sub nom.; North Carolina Util. Com'n v. FCC,* 537 F.2d 787 (4th Cir. 1976), *cert. den.,* 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976), *recon. den.* 552 F.2d 1036 (4th Cir. 1977). Thus, in determining whether the requisite repugnancy exists between the two regimes, it is necessary to review both the relevant portions of the Communications Act of 1934, 47 U.S.C. § 151, *et seq.,* and the history of FCC regulation of CPTE interconnection.

---

**5.** We will assume, *arguendo,* that such activity violated the antitrust laws.

**6.** However, under that section if the proposed tariff is an "increased charge", the FCC may

## 1.

■ Under the Communications Act, telecommunications common carriers are required to file tariffs with the FCC setting forth their "charges, regulations and practices". 47 U.S.C. § 203(a). Such tariffs must be followed until modified and no carrier can deviate from the rates, regulations or practices contained in its filed tariffs. 47 U.S.C. § 203(b)(c). Once promulgated, tariffs are the law and not mere contracts. *Carter v. ATT Co.,* 365 F.2d 486 (5th Cir. 1966), *cert. den.,* 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967); *ATT v. Delta Communications Corp.,* 408 F.Supp. 1075 (S.D.Miss.1976); and *ATT Co. v. Florida-Texas Freight, Inc.,* 357 F.Supp. 977 (S.D.Fla.1973), *aff'd,* 485 F.2d 1390 (5th Cir. 1973). However, all rates and practices must be "just and reasonable" or they are unlawful. 47 U.S.C. § 201(b). It is also unlawful for any carrier to make "any unjust or unreasonable discrimination" in its charges, regulations and practices. 47 U.S.C. § 202(a). Tariffs filed with the FCC become effective in thirty days unless the Commission acts. 47 U.S.C. § 203(b). The FCC may, upon complaint or *sua sponte,* hold hearings on the lawfulness of any new tariff and, should it do so, may suspend the proposed tariff for a period not longer than "three months beyond the time when it would otherwise go into effect." 47 U.S.C. § 204. If the hearing and determination on the lawfulness of the proposed tariff is not completed by the end of the suspension period, the tariff becomes effective subject to the subsequent ruling. 47 U.S.C. § 204.[6] If "after full opportunity for hearing" the FCC determines that any rate or practice is in violation of the act, then it is empowered to "determine and prescribe" practices and rates that will be just, fair, and reasonable and to require carriers to conform to those rates and practices. 47 U.S.C. § 205(a).

require the carrier to keep an accounting of the amounts received so that refunds can be paid if the tariff is disapproved.

This is the exclusive procedure available to the FCC in ruling on the lawfulness of proposed tariffs and in prescribing substitute provisions. *American Telephone and Telegraph v. FCC,* 487 F.2d 865 (2d Cir. 1973); *American Telephone and Telegraph Co. v. FCC,* 449 F.2d 439 (2d Cir. 1971).

## 2.

In its earliest tariffs, ATT had broadly prohibited the attachment to the facilities it furnished subscribers of *any* device not obtained from it. *In the Matter of Carterfone,* 13 FCC2nd 420, 14 FCC2d 571 (1968). Subsequently, the manufacturer of an accessory device which connected acoustically and inductively to a telephone brought an action alleging that ATT's prohibition of the use of the device by its subscribers violated the antitrust laws. ATT asserted immunity under the aforementioned tariffs. The trial court referred the issue of the validity of the tariff to the FCC under the doctrine of primary jurisdiction. *Carter v. ATT Co.,* 250 F.Supp. 188 (N.D.Tex.1966), *aff'd,* 365 F.2d 486 (5th Cir. 1966), *cert. den.,* 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967).

The FCC, responding to the referral on June 26, 1968, declared the tariff unlawful. *In the Matter of Carterfone, supra.* The Commission found that the Carterfone device did not harm the telephone network. It then held that "the tariff is unreasonable because it prohibits the use of interconnecting devices which do not adversely effect the telephone system." 13 FCC2d at 423. The agency said:

> The vice of the present tariff . . . is that it prohibits the use of harmless as well as harmful devices. . . . We are not holding that the telephone companies may not prevent the use of devices which actually cause harm, or that they may not set up reasonable standards to be met by interconnection devices.

13 FCC2d at 424. The FCC found that the tariff had been unreasonable and, hence, unlawful since inception. It said:

> That the telephone companies may not have known prior to the proceedings

herein that the Carterfone was in fact harmless is irrelevant, since they barred its use without regard to its effect upon the telephone system.

13 FCC at 425. The agency reasoned that the finding of retrospective unlawfulness was permissible because the tariff had been initiated by the carriers and the Commission had never ruled upon its lawfulness. Finally, the FCC decided that in light of the unlawful overbreadth of the tariff it should not be declared invalid only as applied to the Carterfone device. Instead, the Commission struck the entire tariff and invited the carriers to "submit new tariffs which will protect the telephone system against harmful devices, and [which] may specify technical standards if they wish." 13 FCC2d at 426.

In November, 1968, ATT filed the tariffs which are the subject of this action. (Hereafter: post-*Carterfone* tariffs). These tariffs permitted directed connection of acoustically and inductively coupled customer-provided devices which met certain specifications but prohibited electrical connection of customer-provided equipment. Devices requiring electrical connection could only be attached with the telephone network through a protective connecting arrangement (PCA) leased from and installed by ATT. The PCA served to insulate the network from the customer-provided equipment and, thereby, protected the network from any potentially harmful attributes of such equipment.

Numerous pleadings were filed with the Commission urging suspension or rejection of the tariffs and the instigation of formal investigations into their lawfulness. On December 24, 1968, the FCC indicated that the post-*Carterfone* tariffs did not violate the precise holding of the *Carterfone* decision. The agency went on to observe that it was not in a position to determine the validity of the tariffs at that time. It concluded:

> In our opinion, these and other matters warrant further consideration by the Commission before it determines whether and what further action, if any, may be

required. We believe that we will be in a better position to make these determinations after we have had a reasonable opportunity to closely observe the effects of the substantial changes now being effectuated by the telephone companies in their interconnection tariffs, the extent to which such changes satisfy reasonable requirements of their subscribers for . . . communication services and facilities, and the implementation by the telephone companies of their representations that they are actively engaged in devising equipment and operating procedures to meet the expressed needs of customers for flexible access to the switched network. Thus, we will permit the tariff revisions to become effective as scheduled with the understanding that in doing so we are not giving any specific approval to the revised tariffs.

*In Re ATT "Foreign Attachments" Tariff Revisions,* 18 FCC2d 605, 610 (1968). The Commission declined to order formal hearings, calling instead on the Common Carrier Bureau to begin informal technical conferences to "ascertain what further changes are necessary, desirable and technically feasible in the various tariff offerings of the telephone companies." 18 FCC2d at 610.

Subsequently, the FCC denied petitions for reconsideration which requested the agency to abandon the informal mode and to institute formal hearings on the validity of the post-*Carterfone* tariffs. The Commission noted that the informal mode would permit it to use independent scientific expertise, and further was

an innovative effort to utilize new and different procedural techniques for identifying, evaluating, and resolving complex scientific and technical issues that are involved in the rendition of common carrier communications service to the public.

18 FCC2d 871, 875 (1969).

On June 1, 1970, the Commission received a report from the National Academy of Sciences indicating, *inter alia,* that although uncontrolled interconnection of customer-provided equipment would pose a risk of

harm to the network, it would be be possible to define technical standards for safe equipment. Acting on this report, the FCC convened advisory committees to develop technical standards for different types of equipment. The Advisory Committee on Dialing and Answering Devices was created January 19, 1972.

On June 16, 1972, the FCC issued a Notice of Inquiry into whether the post-*Carterfone* tariffs should be revised. The Commission stated that it had found the PCA requirement not to violate the *Carterfone* decision, noting that the requirement of a carrier-supplied connecting arrangement had been upheld since originally established in the *Recording Devices* decision, 11 FCC 1033 (1947). Rather, the Commission said:

Our proceeding herein is concerned with the pending and unresolved basic issues now before us as to whether, and to what extent, there is a public need for us to go beyond what we ordered in *Carterfone* and permit customers to provide, in whole or in part, the aforementioned NCSU's [Network Control Signalling Units] and CA's [Connecting Arrangements] . . . and, if so, what terms and conditions should apply to protect the telephone system and services of others.

35 FCC2d 539, 542 (1972). The agency noted that it had ordered technical studies "directed particularly to the question of whether such revisions . . . were technically feasible in view of our concern that the network be protected from harm." 35 FCC2d at 540. On April 3, 1973, the FCC announced that it had received the reports of its advisory committees and invited comments. 40 FCC2d 315 (1973).

On November 17, 1975, the Commission issued its *First Report and Order in Docket Number 19528,* 56 FCC2d 593 (1975), *aff'd, sub nom., North Carolina Util. Comm'n v. FCC,* 552 F.2d 1036 (4th Cir. 1977), *cert. den.* 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154. The agency said of its *Carterfone* decision:

We did not prescribe the terms of the tariff revisions required to satisfy the *Carterfone* policy, but left that to the initiative of the telephone companies.

56 FCC2d 593, 596. The effect of that decision was, the agency continued, to place the burden on the carrier,

to determine that a particular unit or class of customer-provided equipment would cause either technical or economic harm . . . *prior* to the filing of a tariff restricting the use of such equipment. The information accompanying the [post *Carterfone* tariffs] did not demonstrate that the direct electrical connection of all customer-provided equipment would cause harm unless accomplished through the carrier-supplied connecting arrangements provided for in the tariff. At best, it simply reflected one manner in which to protect the network. It was not even argued that this protection was the minimum protection required or the most cost effective. Nevertheless, the Commission, exercising an abundance of caution in protecting the telephone network from possible harm, allowed the tariffs to become effective without ruling explicitly on their lawfulness.

56 FCC2d at 596.

The agency found that in the seven years since the *Carterfone* decision the carriers had, themselves, failed to

propose effective procedures and/or tariff conditions to prevent harm without unduly restricting a customer's right to make reasonable use of the facilities furnished by the carriers.

56 FCC2d at 598. It then stated:

Accordingly, in view of our findings in this proceeding concerning the mechanisms which can cause technical harm and effective means for preventing such harms, the Commission has now reached three separate and independent conclusions. First, the present tariff provisions requiring the use of carrier-supplied connecting arrangements impose an unnecessarily restrictive limitation on the customer's right to make reasonable use of the services and facilities furnished by the carriers. Second, they constitute an unjust and unreasonable discrimination both among users (or classes of users) and among suppliers of terminal equipment.

Third, the standards and procedures prescribed herein for the registration with this Commission of protective circuitry and/or terminal equipment will provide the necessary minimal protection against network harm as has been specified [by technical advisors] and will serve the public interest.

56 FCC2d at pp. 598–599.

The FCC then prescribed a registration program for customer-provided equipment. Under this program devices which met, or which were used with protective circuitry which met, certain specific technical criteria for registration could be electrically connected to the telephone network without a carrier-supplied PCA. However, carriers were permitted to require use of their PCA's with any unregistered equipment used without registered protective circuitry. The specific criteria, developed from the reports of the advisory committees, varied among different classes of equipment.

*B.*

Essential alleges that ATT et al. violated the antitrust laws in requiring that "code-a-phones" obtained from Essential be used only with a carrier-supplied PCA. It further argues that ATT cannot establish the requisite repugnancy between the regimes for implied immunity based on the post-*Carterfone* tariffs because those tariffs were found unlawful and, accordingly, were void *ab initio*. We believe that Essential misconstrues both the substance and effect of the FCC's treatment of the interconnection tariffs.

First, even assuming *arguendo* that the holding of the *First Report* is retroactive, we could not at this time properly deny ATT's claim of immunity solely due to a failure to establish the requisite repugnancy. In striking down the post-*Carterfone* tariffs the FCC did *not* declare unlawful or inconsistent with the policies of the Communications Act the requirement of a carrier-supplied PCA for *any and all* customer-provided equipment. In fact, the Commission expressly prescribed and approved such a requirement for a specific class of equip-

ment: devices which do not comply with regulation program technical criteria (and are not used with registered protective circuitry) and which, therefore, pose a risk of harm to the network. The agency found such a limited requirement necessary to protect the network and to implement its regulatory responsibilities under 47 U.S.C. § 151.

Thus, even assuming retroactivity of the *First Report and Order,* the element of repugnancy cannot be determined until it is known whether the "code-a-phones" distributed by Essential (or the protective circuitry incorporated into some of the devices) complied with the technical criteria of the registration program. If there was compliance, then under the most recent ruling by the FCC the PCA requirement as applied to Essential's "code-a-phones" would be "unreasonable" and not sanctioned by the Communications Act. Accordingly, the requisite repugnancy for implied immunity would be absent. Conversely, if the devices did not comply, then there would be a "plain repugnancy" between the antitrust laws and the Communications Act as implemented by the *First Report.*

The parties have not supplied this information. The issue of qualification under the registration program is within the realm of FCC expertise. Accordingly, before we could properly deny ATT immunity due to the retroactivity of the *First Report* we would be required to stay the proceedings and refer the issue of qualification by Essential's equipment to the FCC under the doctrine primary jurisdiction. *Ricci v. Chicago Merchantile Exchange, supra; Carter v. ATT Co., supra.*

However, in light of the history of the FCC's treatment of the post-*Carterfone* tariff (set forth above) we do not believe that such a stay is required to establish the element of repugnancy. That history indicates, first, that the *First Report* is not retroactive and, second, that the post-*Carterfone* tariffs were sanctioned by the FCC as an interim measure to promote its regulatory goals and needs under the Communications Act.

### 1.

■ Unlike its *Carterfone* decision, the FCC did not indicate that its *First Report* would be given retroactive effect.[7] However, the issue of retroactivity is not within the realm of agency expertise so as to require referral (and deference) to the Commission under primary jurisdiction. *See, Lodges 743 and 1746, etc. v. United Aircraft,* 534 F.2d 422, 452 N. 48 (2d Cir. 1975); and *Retail, Wholesale, and Department Store Union v. N.L.R.B., et al.,* 151 U.S. App.D.C. 209, 219, 466 F.2d 380, 390 (1972).

■ While it is generally within the discretion of an agency to give retroactive effect to its rulings, retroactive application may be precluded by prior agency action. *Arizona Grocery v. Atchison Ry.,* 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932). Moreover, retroactivity should be avoided where the inequity arising from retroactive application is not outweighed by the need to effectuate statutory design or administrative policy.[8] *SEC v. Chenery Corp.,* 332 U.S. 194, 202–203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *Addison v. Holly Hill Co.,* 322 U.S. 607, 620, 64 S.Ct. 1215, 88 L.Ed. 1488 (1944); *Port Terminal R.R. Ass'n v. U. S.,*

---

**7.** Indeed, the agency has specifically stated that the issue of liability (and retroactive effect) has yet to be determined. *Western States Telephone Co. v. ATT, et al.* (FCC Docket No. 16883), Memorandum Opinion and Order FCC–77–655 (Sept. 27, 1977).

**8.** Judge McGown, in *Department Store Union, supra,* 151 U.S.App.D.C. at p. 219, 466 F.2d at p. 390, concisely stated five factors to be balanced in this determination:

(1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.

However, the peculiar posture of this case requires that we deviate slightly from this list.

551 F.2d 1336 (5th Cir. 1977); *Department Store Union, supra, Cf., People of State of Calif., State Lands Comm'n v. Simon,* 504 F.2d 430 (Emp.App.1974); and *NLRB v. Q-T Shoe Manufacturing Co.,* 409 F.2d 1247, 1252 (3d Cir. 1969).

The magnitude of inequity which would result from retroactive replacement of one rule with another depends largely on the extent of *justifiable* reliance upon the former rule and on the extent of the burden which would follow if that reliance was frustrated. Here, despite the fact that ATT and not the FCC was the original source of the post-*Carterfone* tariffs, we believe ATT could justifiably expect that those tariffs would not be *retroactively* replaced. We find extensive support for this determination from the Commission's decisions.

In the *Carterfone* decision, the FCC invited the carriers to submit new tariffs regulating the interconnection of CPTE and yet only provided guidance of the most general nature as to the proper form and content of such tariffs. 13 FCC2d 420, 426, and 56 FCC2d 593, 596. The tariffs filed did not violate the *Carterfone* decision. 18 FCC2d 605, 35 FCC2d 539. Indeed, in striking the tariffs the Commission expressly went beyond what was ordered in *Carterfone.* 35 FCC2d 539, 542. Further, the form of the PCA requirement was not contrary to prior express rulings of the agency. 11 FCC 1033, and 35 FCC2d 539, 542. Shortly after the post-*Carterfone* tariffs were filed with the FCC and before they became effective, the agency was urged to invoke its power under 47 U.S.C. § 204, to suspend operation of the tariffs while inquiry was made into their lawfulness. Had the Commission ex-

ercised that power, and yet failed to complete its hearings within the period of suspension so the tariffs became effective nonetheless, we would have a much different case. *See, People of State of Calif., State Lands Comm'n v. Simon, supra.* However, it expressly declined to do so. 18 FCC2d 605.

Nor were the tariffs so clearly contrary to the spirit of *Carterfone* that ATT should have anticipated their subsequent *and retroactive* disapproval. In fact, the post-*Carterfone* tariffs were an implementation, albeit not the best possible implementation, of the two antagonistic goals underlying the *Carterfone* decision: permitting the widest possible use of CPTE and yet protecting the network from harm. 56 FCC2d 593, 596. The FCC was capable of formulating the registration program to replace the post-*Carterfone* tariffs only after years of technical and scientific studies enabled it to prescribe technical criteria for the different classes of equipment. We are unable to conclude that when the tariffs became effective ATT had full notice that the Commission could later declare the tariffs invalid since inception based on data it would take the agency years to develop.[9]

If ATT's reliance upon the validity of the post-*Carterfone* tariffs is frustrated, it is likely to incur a severe financial burden *via* damage judgments. Accordingly, retroactive application of the *First Report* would produce a large inequity. Would such application so substantially effectuate the statutory design or administrative policy as to warrant the inequities? We think not. The purpose sought by the ruling was to benefit the subscribers to the telephone sys-

---

**9.** In the *First Report* the Commission notes that at the time the tariffs were filed, the carriers had failed to meet the *Carterfone* burden of establishing a risk of harm to the network for every device with restricted use under the tariff. This deficiency was equally apparent in 1968 when the agency declined to suspend the tariffs. Had the agency been able in 1968 to clearly define which equipment posed a risk of harm, it could have implemented its registration program at that time. The FCC apparently lacked the ability to do so. It would be

inequitable to castigate the carriers for their failure to do that which the Commission itself could not do. Accordingly, that deficiency cannot justify a retroactive ruling.

Essential attempts to impute to ATT early and full notice of the unlawfulness of its post-*Carterfone* tariffs based upon correspondence from the FCC Common Carrier Bureau, dated December 16, 1971. Suffice it to say that the Bureau did not have the authorization to make, nor did the letter represent, an official pronouncement of FCC policy.

tem by permitting them the widest and most flexible use of the telephone system consonant with preserving the network from damage. 56 FCC2d 593, 598. It is difficult to see how retrospective application would be substantially superior to prospective application in implementing that purpose.[10]

### 2.

Accordingly, it would be incorrect, based on the *First Report,* to find the post-*Carterfone* tariffs invalid since inception. In fact, the regulatory history establishes that, up until the *First Report,* the FCC sanctioned those tariffs as a means to effectuate Commission policy.

■ When *Carterfone* was decided, the Commission was not prepared to harmonize its potentially antagonistic policies. To fully do so would have required the ability to effectively discriminate between CPTE which did pose a risk of harm to the network and that which did not. With respect to equipment that electrically connected to the network, the FCC lacked at that time the technical information and expertise to make such discriminations. Similarly, the post-*Carterfone* tariffs failed to make such discriminations; nevertheless, through the PCA requirement, those tariffs allowed use of *all* CPTE and yet adequately protected the network. Thus, the FCC permitted the tariffs to become effective for two reasons. First, it wished to observe the tariffs in operation to see if they were sufficient to meet subscriber needs and to determine what, if any, further action might be required. 18 FCC2d 605, 610; 18 FCC2d 871, 875. Second, the tariffs were sanctioned as an interim means of protecting the network while the agency developed the necessary

data to formulate its registration program. 18 FCC2d 871, 875; 35 FCC2d 539, 540 and 542; 56 FCC2d 593, 596.[11] When the agency developed sufficient expertise to devise the registration program, the post-*Carterfone* tariffs were no longer needed and, in fact, technically obsolete. Accordingly, to promulgate that registration program, under 47 U.S.C. § 205(a), the Commission had to declare the post-*Carterfone* tariffs unlawful. Thus, from inception to invalidation, the post-*Carterfone* tariffs (and the PCA requirements contained therein) were sanctioned by the FCC as a means to serve its regulatory responsibilities and administrative needs. Accordingly, during that period there was, with regard to the PCA requirements, a "plain repugnancy" between the regulatory and antitrust regimes. That agency needs and perceptions have subsequently changed does not undermine this conclusion. *See, Gordon v. N.Y.S.E., supra.*

### III.

We now turn to the second element for implied immunity: congressional intent to resolve the repugnancy against the antitrust laws and in favor of the regulatory scheme. The Supreme Court cases indicate that this congressional intent is to be largely educed from the form, scope, and content of the authority devolving to the agency and the regulated industry under the enabling legislation. Further,

Recent cases make it clear that the relevant " aspect of the agency's jurisdiction must be sufficiently central to the purposes of the enabling statute so that implied repeal of the antitrust laws is 'necessary to make the [regulatory scheme] work.' "

---

10. It might be argued that allowing damage recovery by suppliers of CPTE whose market activity was "stunted" by the post-*Carterfone* tariffs would indirectly benefit network subscribers by providing expansion capital for CPTE production. However, this effect is at best remote and speculative. If the CPTE market is not sufficiently profitable to attract ex-

pansion capital on its own merit, it is extremely unlikely that any damages collected from ATT would be invested in that market.

11. In this respect, we find it significant that the FCC postponed the effective date of the *Carterfone* decision until the date the post-*Carterfone* tariffs were to take effect. See, 15 FCC2d 31.

*Cantor v. Detroit Edison Co.,* 428 U.S. 579, 597–98, N. 37, 96 S.Ct. 3110, 3120, 49 L.Ed.2d 1141 (1976).[12]

### A.

On this basis, broad generalizations can be stated. First, where the act creating the regulatory scheme expressly *requires* the regulated entity to perform the conduct alleged to violate the antitrust laws, immunity is implied without more. *U. S. v. National Association of Securities Dealers, supra,* 422 U.S., at p. 699, 95 S.Ct. 2427 (Dicta). It is presumed that Congress must have been aware that it was mandating a violation of the antitrust laws and, accordingly, must have intended a repeal of those laws with respect to the required activity.

Second, although not required in all cases,[13] immunity is implied where the alleged violation falls within a "pervasive regulatory scheme". Such a scheme is said to exist where the scope of regulation is so extensive, and its content so specific, that the range of optional behavior left to the regulated entity is severely limited. Thus, a "pervasive regulatory scheme" effectively eliminates the ability of the regulated entity to exercise independent business judgment in its relevant market activities. The exercise of such judgment by market participants is the basic operating premise of the market controls envisioned by the antitrust laws. Accordingly, in promulgating a regulatory scheme which negates the fundamental assumption of the antitrust laws, Congress clearly intended that the scheme should prevail over those laws in the event of conflict. *See, Otter Tail Power Co., supra,* 410 U.S., at p. 374, 93 S.Ct. 1022; *U. S. v. Philadelphia National Bank, supra,* 374 U.S., at p. 352, 83 S.Ct. 1715; and *U. S. v. Radio Corporation of America,* 358 U.S. 334, 350–51, 79 S.Ct. 457, 3 L.Ed.2d 354. Immu-

nity has also been implied for the activities of statutorily created self-regulatory bodies where there is "pervasive supervisory authority" vested in a federal agency. See *U. S. v. NASD, supra,* 422 U.S., at pp. 732–33, 95 S.Ct. 2427.

Third, where the enabling act *authorizes* the regulated entity to perform the conduct alleged to violate the antitrust laws but subjects such conduct to regulatory supervision, generally immunity is implied for authorized conduct. It is assumed that conduct falling within the range of authorized activity was deemed necessary by Congress, until the contrary is indicated by the agency, to implement the purposes of the act and, accordingly, was intended to be exempt from the antitrust laws.

Thus, in *Gordon v. N.Y.S.E., supra,* where the Exchange was authorized by the Securities Exchange Act to promulgate fixed commission rates for its members and where § 19(b)(9) of that Act empowered the SEC to disapprove such rates and order revisions, the Exchange was held immune from antitrust sanction for its rate-making activity. The Court reasoned that implication of immunity was required to permit the Act to function as intended by Congress, for to withhold immunity "would render nugatory the legislative provision for regulatory agency supervision of the [challenged activity]." 422 U.S. at p. 691, 95 S.Ct. at p. 2615. Similarly, in *U. S. v. NASD, supra,* 422 U.S., at pp. 729–30, 95 S.Ct. 2427, the Court implied immunity for certain vertical restrictions imposed by mutual funds on the distribution of their shares. § 22(f) of the Investment Company Act authorized the funds to restrict the negotiability and transferability of their shares provided the restrictions not contravene regulations of the SEC. The particular conduct immunized was found to be

---

**12.** In deciding this motion, the court has used care in seeking guidance from cases, such as *Cantor, supra,* dealing with the State Action doctrine. Facially that doctrine is similar to implied immunity. However, whereas the first resolves conflict between two policy formulators of different competence, the second resolves conflict between different policies of a

single formulator. Thus, the actual analysis under the two doctrines may differ significantly. *Cf., Cantor, supra,* at pp. 595–97, 96 S.Ct. 3110.

**13.** *See, Gordon v. N.Y.S.E., supra,* 422 U.S. at pp. 688–689, 95 S.Ct. 2598.

"among the kinds of restrictions Congress contemplated when it enacted that section." 422 U.S. at p. 721, 95 S.Ct. at p. 2444. *See also,* Stewart, J., concurring in *Gordon, supra,* 422 U.S., at pp. 692–93, 95 S.Ct. 2598.

■ Finally, immunity may be implied where the challenged conduct is subject to a regulatory scheme which expressly directs the agency to consider antitrust policies in the context of the regulated industry. Congress is presumed to have intended such a scheme to operate as a more refined, but *functionally equivalent,* substitute for the antitrust laws. In such case it would be both pointless and an invasion of the agency's competence to hold the conduct subject to the antitrust laws. *See, Hughes Tool Co. v. TWA, Inc.,* 409 U.S. 363, 385–86, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973) and *Pan American World Airways v. U.S.,* 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). *See also,* White, J. dissenting in *U. S. v. NASD, supra,* 422 U.S., at pp. 740–41, 95 S.Ct. 2427.

### B.

In the case at bar we need·not decide whether regulatory plan of Communications Act of 1934 is a "pervasive regulatory scheme" [14] or a functionally equivalent substitute for the antitrust laws.[15] Rather, we find Congress intended by the Communications Act of 1934 that the antitrust laws be repealed in this particular and discrete instance. *U. S. v. NASD, supra,* and *Gordon v. N.Y.S.E., supra.*

■ The challenged conduct is central, rather than collateral, to the purposes of the Communications Act of 1934. That Act seeks:

> to make available, so far as possible, to all people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with ad-

equate facilities at reasonable charges, . . . 47 U.S.C. § 151.

The protection of the telephone network from damage by unrestricted interconnection of CPTE clearly falls within that purpose. *Cf., North Carolina Util. Comm'n v. FCC, supra.* One of the effects of the post-*Carterfone* tariffs was to provide such protection.

Further, the post-*Carterfone* tariffs and the PCA requirement fall within the range of activities that Congress authorized carriers to perform under the Communications Act. It is obvious from the provisions of the Act that Congress intended the wire carriers to take a substantial role in formulating their rates and "practices" by their tariff filings. 47 U.S.C. § 203(a). Congress must have been aware that the tariffs would frequently have anti-competitive effects which would, in ordinary events, violate the antitrust laws. However, the only limitations Congress placed on the tariffs was that the rates and practices contained therein be just, reasonable, and non-discriminatory. 47 U.S.C. §§ 201(b), 202(a).

Nevertheless, Congress did invest the FCC with responsibility to supervise the carrier's tariffs. To that end, the agency was given substantial powers: the capacity to inquire, upon complaint or *sua sponte,* into the lawfulness of any rate or practice (47 U.S.C. § 204); upon a finding of unlawfulness, the power to prescribe rates and practices binding the carrier (47 U.S.C. § 205(a)); and the capacity to promulgate such additional rules and regulations as are necessary in the public interest to effectuate the Act (47 U.S.C. § 201(b)). Congress obviously intended that in the exercise of those powers the FCC consider many factors peculiar to the communications industry in addition to effects on competition. *See, FCC v. RCA Communications, Inc., su-*

---

**14.** *But see, U. S. v. RCA, supra,* 358 U.S., at pp. 348–49, 79 S.Ct. 457 where the Court contrasted the regulation of broadcasters under the Communications Act (held not to be a "pervasive regulatory scheme") with the regulation of wire common carriers.

**15.** *But see, U. S. v. RCA, supra,* at pp. 339–46, 79 S.Ct. 457; *FCC v. RCA Communications Inc.,* 346 U.S. 86, 73 S.Ct. 998, 97 L.Ed. 1470 (1956); *U. S. v. ATT Co.,* 427 F.Supp. 51, 61 (D.D.C.1976), *cert. den.,* 429 U.S. 1071, 97 S.Ct. 824, 50 L.Ed.2d 799 (1977) and *Macom Products Corp. v. ATT Co.,* 359 F.Supp. 973, 976 (C.D.Cal.1973).

*pra,* 346 U.S., at pp. 93–95, 73 S.Ct. 998. While not required for implication of immunity,[16] the FCC, as demonstrated above, has vigorously exercised its supervisory authority with respect to the conduct relevant here.

To permit the antitrust laws to be applied to carrier tariff activity which has been sanctioned by the FCC would clearly prevent the Communications Act from functioning as Congress intended. Accordingly, in the event of conflict, the antitrust laws must give way to the regulatory scheme; immunity must be implied. Support for this conclusion arises from the similarities between the regulatory scheme created by the Communications Act and those considered in *U. S. v. NASD, supra,* and *Gordon v. NYSE, supra.* See also, *Phonetele, Inc. v. ATT Co.,* 435 F.Supp. 207 (C.D. Cal.1977).

Essential also alleges violations of the antitrust laws by the manner in which the tariffs were enforced. However, to the extent that these alleged violations were ancillary to or an implementation of the post-*Carterfone* tariffs, such conduct is similarly entitled to immunity. In *U. S. v. NASD, supra,* having found immunity for the NASD's promulgation of rules, the Court held that the interpretation and implementation of the rules was similarly exempt. The Court reasoned:

> We further conclude that the Government's attack on NASD interpretations of those rules cannot be maintained under the Sherman Act, for we see no meaningful distinction between the Association's rules and the manner in which it construes and implements them. Each is equally a subject of SEC oversight.

422 U.S. at p. 733, 95 S.Ct. at p. 2449. Further, the Court extended immunity to activity deemed "ancillary" to the conduct held immune as authorized and subject to agency supervision. It said:

> There can be little question that the broad regulatory authority conferred upon the SEC by the Maloney and Invest-

ment Company Acts enables it to monitor the activities questioned in Count I, and the history of Commission regulations suggest no laxity in the exercise of this authority. To the extent that any of appellees' ancillary activities frustrate the SEC's regulatory objectives it has ample authority to eliminate them.

422 U.S. at p. 734, 95 S.Ct. at p. 2450. *Cf., U. S. Navigation Co. v. Cunard Steamship Co.,* 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408 (1932).

Essential also alleges that there should be no immunity under the post-*Carterfone* tariffs because they were procured by fraud and therefore remained subject to antitrust sanctions under the rationale of *Walker Process Equipment Co. v. Food Mach. & Chem. Corp.,* 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965) and *Mt. Hood Stages, Inc. v. Greyhound Corp., supra.* However, the complaint is insufficient to support this theory of recovery. Fraud must be particularly and specifically averred. Rule 9(b), Federal Rules of Civil Procedure.

Defendants' motion to dismiss is granted. Defendants shall submit an appropriate order in conformity with this opinion within ten (10) days from the date hereof.