NORTHEASTERN TELEPHONE
COMPANY, Plaintiff,

v.

AMERICAN TELEPHONE AND TELE-
GRAPH COMPANY, Western Electric
Company, Inc., and the Southern New
England Telephone Company, Defend-
ants.

Civ. No. B–75–319.

United States District Court,
D. Connecticut.

Nov. 30, 1978.

J. Daniel Sagarin, Schless & Sagarin, Bridgeport, Conn., Philip E. McCleery, pro hac vice, J. Robert Sheehy, pro hac vice, Sheehy, Lovelace & Mayfield, Waco, Tex., for plaintiff.

Marshall R. Collins, Asst. Atty. Gen., Hartford, Conn., for amicus curiae.

John M. Goodman, Leonard Joseph, J. Paul McGrath, Dewey, Ballantine, Bushby, Palmer & Wood, New York City, Lewis H. Ulman and Peter J. Tyrrell, William J. O'Keefe, Anne U. MacClintock, Southern New England Telephone Co., New Haven, Conn., William R. Moller, Moller & Horton, Hartford, Conn., Burton K. Katkin, New York City, for defendants.

**RULING ON MOTIONS TO DISMISS**

DALY, District Judge.

This case arises from the involvement of a regulated telephone utility monopoly in the business terminal equipment market made competitive as the result of the *Carterfone*[1] decision of the Federal Communications Commission ("FCC" or "the Commission"). Plaintiff Northeastern Telephone Company ("Northeastern") sells telephone terminal equipment to customers in Connecticut. This equipment is installed on the customer's premises and connected to the public telephone lines. The defendant Southern New England Telephone Company ("SNET"), owned in part by defendant American Telephone & Telegraph Company also markets terminal equipment, which is manufactured by the defendant Western Electric Company, and which is subject to the supervision of the FCC and the Connecticut Public Utilities Control Authority ("PUCA" or "the Authority"). *See* Conn. Gen.Stat. § 16–1 (1977). Northeastern has brought this action alleging that the defendants have monopolized, and have attempted and conspired to monopolize and restrain trade in the Connecticut business terminal equipment market in violation of sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2, and in violation of the Connecticut Antitrust Act, Conn.Gen. Stat. §§ 35–26 to 28, 35–35. The request for relief includes an injunction and treble damages under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26. The defendants have moved to dismiss claiming immunity from antitrust laws on the basis of pervasive federal and state regulation, and also arguing that the challenged activities are within the state-action exception to the Sherman Act. *See Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1942). The defendants also assert that certain activities challenged in the complaint are protected by the First Amendment. Finally, the defendants argue that the Connecticut Antitrust Act is inapplicable.

1. *Use of Carterfone Device in Message Toll Telephone Service,* 13 F.C.C.2d 420, *reconsideration denied,* 14 F.C.C.2d 571 (1968). *See also Carter v. American Tel. & Tel. Co.,* 365 F.2d 486 (5th Cir. 1966), *cert. denied,* 385 U.S. 1008, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967); *Hush-A-Phone Corp. v. United States,* 99 U.S.App.D.C. 190, 193, 238 F.2d 266, 269 (1956).

## I. IMPLIED ANTITRUST IMMUNITY DUE TO FEDERAL REGULATION.

### FCC REGULATION

Congress articulated a broad mandate for the FCC in the Communications Act: "to make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges . . .." 47 U.S.C. § 151. The FCC's primary tool for regulating telecommunications common carriers is the tariff, a formal schedule of a carrier's charges, classifications, regulations and practices required to be filed with the Commission before conducting business. 47 U.S.C. § 203(a). All unjust or unreasonable tariffs are unlawful, § 201(b), as is unjust or unreasonable discrimination in tariffs. § 202(a). The Commission may, at its own initiative or upon complaint of an interested party, hold hearings as to the lawfulness of any new tariff and suspend its effective date. If the investigation has not been completed within five months past the original effective date,[2] the tariff becomes operative pending a determination of its lawfulness. § 204(a). If the FCC upon completion of the investigation concludes that the scrutinized activity violates the Act, the Commission may issue cease-and-desist orders or require the carrier to adopt prescribed rates and practices. § 205(a). Once the tariffs become effective, the common carriers must conform to them. § 203(c).

In addition to examining tariffs, the FCC may also establish rules and regulations "necessary in the public interest" to carry out its statutory duties. § 201(b). The carriers themselves are under a duty "to furnish such communication service upon reasonable request." § 201(a). Also, the FCC must "keep itself informed . . . as to technical developments and improvements in wire . . . communication . . . to the end that the benefits of new inventions and developments may be made available to the people of the United States." § 218.

The Communications Act is not without sanctions for unlawful conduct by the carriers. The failure to obey an FCC order will result in a fine of $1,000 for every violation, to be levied each day against continuing offenses. § 205(b). A carrier is also liable to persons injured by conduct in violation of the Act for the "full amount of damages sustained . . . together with a reasonable counsel or attorney's fee." § 206, §§ 207–209.

▪ The standard mandated by the Communications Act to govern FCC regulation of telecommunications common carriers is the "public interest." § 201(b). Although Congress has not explicitly directed the FCC to consider competition as a factor, the FCC clearly includes competitive concerns in its decision-making process. However, competition is only one of numerous factors that the Commission must consider, and may not be looked upon as an end in itself. *E. g., FCC v. RCA Communications, Inc.,* 346 U.S. 86, 94, 73 S.Ct. 998, 97 L.Ed. 1470 (1953); *Hawaiian Telephone Co. v. FCC,* 162 U.S.App.D.C. 229, 235, 498 F.2d 771, 777 (1974); *Satellite Business Systems,* 62 F.C.C.2d 997, 1070 (1977).

Prior to 1968, many telephone companies would permit only company-provided telephone equipment to be attached to their telephone lines. This practice, embodied in both state and federal tariffs, resulted in a telephone equipment monopoly, and aided the states in redistributing the cost of telephone services by setting equipment prices at levels related only indirectly to cost. In *Use of Carterfone Device in Message Toll Telephone Service,* 13 F.C.C.2d 420, *reconsideration denied,* 14 F.C.C.2d 571 (1968), the FCC embarked upon a major reform of telephone interconnection. In that decision, the FCC found that the complete prohibition against interconnection of customer-owned equipment was unreasonable and unlawful because it was done without regard to whether interconnection would "adversely affect the telephone company's operation

---

**2.** The five month period was established by Congress in 1976. Pub.L. 94–376, § 2, 90 Stat.

1080. Prior to that time, the maximum period of delay for investigation was 90 days.

or the telephone system's utility for others." 13 F.C.C.2d at 424. Furthermore, the FCC found the complete exclusion unreasonably discriminatory because only the telephone company's equipment could be connected. *Id.* That portion of the tariff incorporating the interconnection prohibition was therefore stricken.

The *Carterfone* decision left to the companies the task of accommodating the traditional need to protect the safety and effectiveness of the telephone lines with the new requirement of liberalized customer interconnection. In November 1968, defendant AT&T filed a new tariff allowing interconnection for the most part only through a company-provided protective device. In response, the FCC allowed the new tariff to become effective while explicitly reserving decision on its lawfulness. *AT&T "Foreign Attachment" Tariff Revisions,* 15 F.C.C.2d 605, 610 (1968), *reconsideration denied,* 18 F.C.C.2d 871 (1969). The FCC then embarked upon an extensive investigation of the interconnection question, commissioning a study by the National Academy of Sciences and commencing an informal investigation of its own.

In 1972, the year that plaintiff Northeastern entered the Connecticut terminal equipment market, the FCC convened a joint federal and state board to investigate interconnection. By 1974, however, the spectre of conflicting standards established by the various state regulatory agencies prompted the FCC to assert "paramount jurisdiction" over the technical standards for all interconnection equipment. *Telerent Leasing Corp.,* 45 F.C.C.2d 204 (1974), *aff'd sub nom. North Carolina Util. Comm'n v. FCC,* 537 F.2d 787 (4th Cir. 1976), *cert.* *denied,* 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976).

The present complaint was filed in October of 1975. In November of that year, the FCC promulgated a registration program for interconnect equipment, and directed telephone companies to permit direct interconnection of all equipment that met the Commission's criteria. Direct interconnection was also required for equipment that included a protective device that similarly met the Commission's criteria. Otherwise, the telephone company could still require the customer to use a company-provided protective device just as the post-*Carterfone* tariffs had required. *Interstate and Foreign MTS and WATS,* 56 F.C.C.2d 593 (1975), *modified,* 58 F.C.C.2d 736 (1976), *aff'd sub nom. North Carolina Util. Comm'n v. FCC* 552 F.2d 1036 (4th Cir.), *cert. denied,* 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977). *See* 47 C.F.R. § 68 (1976). The FCC found that the carriers had failed to "propose effective procedures and/or tariff conditions to prevent harm without unduly restricting a customer's right to make reasonable use of the facilities furnished by the carriers." 56 F.C.C.2d at 598. Accordingly, the Commission declared the post-*Carterfone* tariffs to be an unnecessary interference with a customer's right to make reasonable use of the telephone lines, and an unjust and unreasonable discrimination against certain users and suppliers of terminal equipment. *Id.*

## IMPLIED IMMUNITY

The Communications Act of 1934 does not include an explicit, general exemption of FCC regulated activities from the antitrust laws; therefore the issue becomes one of implied immunity.[3] It is also clear

---

**3.** The Act does provide a narrow exemption for telephone company consolidations and acquisitions approved by the FCC. 47 U.S.C. §§ 221(a), 222(c)(1). Nevertheless, the inclusion of specific exemptions from the antitrust laws neither precludes other implied exemptions, *e. g., Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963); *Terminal Warehouse Co. v. Pennsylvania R. Co.* 297 U.S. 500, 56 S.Ct. 546, 80 L.Ed. 827 (1936), nor necessarily supports a broader immunity, *e. g., California v. Federal* *Power Comm'n,* 369 U.S. 482, 485, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962); *United States v. Borden Co.,* 308 U.S. 188, 198–202, 60 S.Ct. 182, 84 L.Ed. 181 (1939). These explicit immunity provisions of the Communications Act do not suggest a blanket exemption, *Industrial Commun. Systems, Inc. v. Pacific Tel. & Tel. Co.,* 505 F.2d 152, 156 (9th Cir. 1974), nor do they necessarily constitute the only exemptions available. *International Tel. & Tel. Co. v. General Tel. & Elec. Corp.,* 518 F.2d 913, 918–19 (9th Cir. 1975).

that regulation by the FCC does not give rise to a blanket immunity by implication.[4] *United States v. American Tel. and Tel. Co.*, 427 F.Supp. 57, 61 (D.D.C.1976), *cert. denied*, 429 U.S. 1071, 97 S.Ct. 824, 50 L.Ed.2d 799 (1977). Therefore a claim of immunity must focus on the type of activity challenged[5]—the design of interconnect equipment—keeping in mind that implied repeal is not favored.[6] *United States v. Philadelphia Nat'l Bank*, 374 U.S. 321, 348, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963).

The plaintiff's complaint is sparsely worded. The portion related to the areas of federal regulation described above refers primarily to discrimination in services and the designing of interconnect equipment to hinder competition. Thus the complaint raises a retrospective challenge to the post-*Carterfone* tariffs initiated by the defendants and which remained in effect until the establishment of the FCC's registration program for interconnection equipment. As noted earlier, these tariffs became effective without the explicit approval of the FCC, and were later ruled violative of the Communications Act. Plaintiff's brief in opposition to the Motion to Dismiss explained that Northeastern was not challenging the tariff. But the plaintiff argued later in its brief that application of the Sherman Act

to the post-*Carterfone* tariffs would advance the principles of the antitrust laws while vindicating the Commission's policies under the Communications Act. In response to this Court's request for a clarification of the plaintiff's position, Northeastern explained that it did not intend to challenge the "validity" of the pre-registration tariff or the connecting arrangement requirement of that tariff. Rather, plaintiff stated that it was challenging the specifics of the connecting arrangement, *i. e.*, the requirement of a 110-volt external power source and an interface device necessitating a four-wire, instead of a two-wire, outlet.

This distinction based upon the specificity of the particular interconnection conduct challenged appears at first glance to have some relevance to this immunity debate. As the preceding summary of the regulatory background indicates, the FCC in *Carterfone* did not explicitly mandate any particular design for accommodating the public's right to increased access and the need to protect the safety and effectiveness of the telephone network. It should also be noted, however, that the widespread requirement of an interconnection device supplied by AT&T was itself similarly not required. In addition, the public policy be-

---

**4.** Indeed, a blanket immunity from the antitrust laws due to the existence of a regulatory scheme may require "an unequivocally declared purpose" on the part of Congress. *Pan American World Airways, Inc. v. United States*, 371 U.S. 296, 304–305, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963). *See Hughes Tool Co. v. Trans World Airline, Inc.*, 409 U.S. 363, 387, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).

**5.** This portion of the opinion focuses exclusively upon federally regulated conduct, although defendants throughout their papers refer to both federal and state regulation in support of their immunity argument based upon "pervasive" regulation. Their immunity theory is derived from various Supreme Court decisions accommodating the antitrust laws with exclusively federal regulation. The need for antitrust immunity arises in those cases because of the conflict between two congressional schemes of equal status. State regulation, however, has a status inferior to federal enactments, and thus becomes the victim of federal preemption under the Supremacy Clause. State regulation is relevant to limitations upon the sweep of the federal antitrust laws only in

the manner discussed in the succeeding section of this opinion dealing with the state action exception under *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1942), and its progeny.

**6.** Other district courts have split on the immunity question. Most have favored immunity, *see Selectron, Inc. v. Pacific Northwest Bell Tel. Co.*, Civil No. 76–965–BE (D.Ore. June 19, 1978); *Monitor Bus. Machines, Inc. v. American Tel. & Tel. Co.*, 1978–1 CCH Trade Regulation Rep. ¶ 62,030 (C.D.Cal.1978); *Essential Communication Systems, Inc. v. American Tel. & Tel. Co.*, 446 F.Supp. 1090 (D.N.J.1978); *DASA Corp. v. General Tel. Co.*, 1977–2 CCH Trade Regulation Rep. ¶ 61,610 (C.D.Cal.1977); *Phonetele, Inc. v. American Tel. & Tel. Co.*, 435 F.Supp. 207 (C.D.Cal.1977). Only two decisions have held to the contrary. *See Jarvis, Inc. v. American Tel. & Tel. Co.*, Civil No. 74–1674 (D.D.C. Aug. 7, 1978); *Macom Products Corp. v. American Tel. & Tel. Co.*, 359 F.Supp. 973 (C.D.Calif.1973).

hind liberalized interconnection and the means chosen to serve that policy given the available technology are so closely intertwined that the question whether the federal courts and the FCC are to share direct oversight responsibilities, or the FCC is to govern such conduct exclusively, remains the same regardless of the specificity of the interconnection conduct challenged. *See United States v. National Association of Securities Dealers,* 422 U.S. 694, 733, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975) ("NASD"); *Hughes Tool Co. v. Trans World Airlines,* 409 U.S. 363, 379, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973).

▉ Defendants argue that the conduct mentioned in the complaint is immune because of pervasive regulation under a public interest standard that makes application of the "unidimensional" federal antitrust laws inappropriate. As a general rule, immunity is implied only in cases of "plain repugnancy" between the regulatory provisions and the antitrust laws. And an immunity will be recognized only when necessary to make the regulatory statutes work, and even then only to the minimum extent necessary. *Gordon v. New York Stock Exchange, Inc.,* 422 U.S. 659, 682–83, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); *United States v. Philadelphia Nat'l Bank, supra* 374 U.S. at 350–51, 83 S.Ct. 1715 (1963); *Silver v. New York Stock Exchange,* 373 U.S. 341, 357–58, 83

S.Ct. 1246, 10 L.Ed.2d 389 (1963). These widely repeated refrains, however, are of limited value in application. The issue in most cases is whether immunity is necessary to the regulatory body's ability to exercise its statutory mandate.[7] With regard to immunity inferred from pervasive regulation, the Supreme Court has mentioned two rationales: whether "federal regulation . . . is so comprehensive that enforcement of the antitrust laws would be either *unnecessary,* in light of the completeness of the regulatory structure, or *disruptive* of that structure." *United States v. Philadelphia National Bank,* 374 U.S. *supra* at 352, 83 S.Ct. at 1735. (Emphasis added).[8] The inquiry must focus on both the legislative framework and the actual role played by the regulatory agency.

In support of their immunity theory, defendants rely primarily on two 1975 Supreme Court cases, *Gordon v. New York Stock Exchange, supra,* and *United States v. NASD, supra.* In *Gordon,* the Supreme Court rejected an antitrust challenge to the fixed commission rates of the New York Stock Exchange, in part because the SEC had been actively investigating the practice of fixed commissions. These investigations paralleled somewhat the FCC proceedings regarding interconnection. The Court also concluded, however, that § 19(b)(9) of the Securities Exchange Act of 1934 appeared

---

7. The issue is not whether immunity is necessary to meet the goals of the regulatory program, *i. e.,* whether the challenged practice is necessary to protect the public interest although clearly constituting a violation of the antitrust laws. Thus, plaintiff's argument that the general goals of the Communications Act are consistent with those of the Sherman Act is misfocused. As the Court majority explained in *Gordon v. NYSE, supra* 422 U.S. at 688, 95 S.Ct. at 2614,

> [o]n the one hand, there is a factual question as to whether fixed commission rates are actually necessary to the operation of the exchanges as contemplated under the Securities Exchange Act. On the other hand, there is a legal question as to whether allowance of an antitrust suit would conflict with the operation of the regulatory scheme which specifically authorizes the SEC to oversee the fixing of commission rates. The factual question is not before us in this case. Rather, we are concerned with whether antitrust immunity,

as a matter of law, must be implied in order to permit the Exchange Act to function as envisioned by Congress. The issue of the wisdom of fixed rates becomes relevant only where it is determined that there is no antitrust immunity.

Justices Stewart and Brennan disagreed, declaring that the inconsistency required to support a finding of immunity must be one that threatens the "aims of the regulatory framework." *Id.* at 658, 95 S.Ct. 2427. (Stewart and Brennan, JJ., concurring) (quoting *Silver v. NYSE, supra* 373 U.S. at 361, 83 S.Ct. 1246).

8. The Supreme Court on a number of occasions has described public utility or common carrier regulation as pervasive. *See Otter Tail Power Co. v. United States,* 410 U.S. 366, 377, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973); *United States v. Philadelphia Nat'l Bank, supra* at 352; *United States v. Radio Corp. of Am.,* 358 U.S. 334, 339–346, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959).

explicitly to authorize the "fixing" of rates, normally a *per se* violation of the antitrust laws, subject only to the supervision of the Securities and Exchange Commission. The Court reasoned that Congress, having given the SEC authority to regulate fixed rates, must have intended such rates to be legal absent SEC disapproval. Otherwise, the authority granted the SEC to approve fixed rates would be negated by the antitrust laws, and the authority to disapprove fixed rates would be superfluous. Finally, the Court cited as significant to the immunity issue recent legislation affirming its view of congressional intent. In contrast, the Communications Act includes no such approval[9] of anticompetitive interconnection practices and defendants have not directed this Court's attention to any recent legislation corroborating their exclusive jurisdiction claim.

A similar distinction may be drawn between this case and *United States v. NASD, supra,* in which the Supreme Court considered the applicability of the Sherman Act to certain vertical restraints used by mutual funds to limit a secondary market in their shares. Absent immunity, such restraints would have constituted refusals to deal—again *per se* violations of the antitrust laws. The Court recognized an immunity defense because § 22(f) of the Investment Company Act of 1940, 15 U.S.C. § 80a–22(f), was looked upon as a clear congressional authorization of vertical restrictions upon the sale of mutual fund shares, so long as the restrictions were included in the registration statements and were not prohibited by SEC rules or regula-

tions.[10] Once again, there is no equivalent congressional endorsement of anticompetitive interconnection practices found in the Communications Act.

Of potentially greater persuasiveness is the Supreme Court's treatment of the alleged interdealer horizontal conspiracy in *NASD.* Because the restraints were not authorized by Congress, and thus were ineligible for the same immunity conferred upon the mutual funds, the Court went on to consider whether the SEC's exercise of authority over the rules and practices of the NASD was "sufficiently pervasive to confer an implied immunity." *Id.* 422 U.S. at 730, 95 S.Ct. at 2448. In relation to the SEC's regulation of the NASD, the Court found the pervasiveness sufficient to imply an immunity. The SEC's authority over the rules of the NASD is similar to that of the FCC over the tariffed activities of telecommunications common carriers. Both commissions must consider the interest of the general public, and each considers an inquiry into the public interest to include an examination of the potential benefits of competition as well as other factors. However, the regulatory frameworks also differ significantly.

First, the Maloney Act requires that before a securities association will be approved by the SEC it must have established rules designed to "remove impediments to and perfect the mechanism of a free and open market." 15 U.S.C. § 78o–3(b)(6). The Communications Act does not include such an explicit delegation of competitive supervision.[11] More importantly, the SEC

---

9. The absence of such an approval may be due to the lack of available technology or a recognizable interconnect market in 1934. Nevertheless, *Gordon* is less persuasive as a result.

10. The vertical restraints attacked in the complaint were "the kinds of restrictions Congress contemplated when it enacted that section. And this conclusion necessarily leads to a determination that they are immune from liability under the Sherman Act, for we see no way to reconcile the Commission's power to authorize these restrictions with the competing mandate of the antitrust laws." *United States v. NASD, supra* at 721–22, 95 S.Ct. at 2444.

11. It has been argued that the lack of competitive criteria in the Communications Act should not be seen as an indication that Congress did not intend the FCC to supplant the antitrust laws. Note *AT&T and the Antitrust Laws: A Strict Test for Implied Immunity,* 85 Yale L.J. 254, 263 n. 44 (1975). *But cf. Otter Tail Power Co. v. United States, supra* 410 U.S. at 372–75, 93 S.Ct. 1022; *United States v. NASD, supra* 422 U.S. at 743, 95 S.Ct. 2427 (White, J., dissenting). The reason given is that competition standards made sense only in those regulated industries in which competition still existed to a significant extent. The telephone industry, however, was conceded by Congress to be a

oversight is mandatory and narrowly focused, while the FCC regulation is discretionary and its area of exercise sweeping. The NASD rules *must* be approved before the association may register, and the SEC *must* disapprove all subsequent changes if they conflict with the Act's criteria. 15 U.S.C. § 78o–3(j). The Maloney Act thus guarantees that the NASD rules will be scrutinized for their compatibility with the public interest in competition and the mere existence of a rule represents an agency policy decision.[12] This close supervision by the SEC makes application of the antitrust laws unnecessary, and makes a conflict between the courts and the Commission inevitable if an antitrust plaintiff is to succeed. In contrast, tariffs may become effective upon the mere acquiescence of the FCC, and must become effective if the FCC has not ruled them unlawful within five months of the proposed effective date. The Com-

munications Act thus includes no such assurance of regulatory review, and the enactment of a tariff does not necessarily represent a potential conflict with the antitrust laws.

The importance of review of competitive impact by the agency prior to the challenged conduct can be seen in the cases concerning the relationship between the antitrust laws and the Civil Aeronautics Board ("CAB"). In *Pan American World Airways, Inc. v. United States,* 371 U.S. 296, 83 S.Ct. 476, 9 L.Ed.2d 325 (1963), the Court was asked to enjoin under the Sherman Act certain efforts at territorial restraints by the defendant airline. In finding an immunity the Court examined the statutory framework, which included an explicit delegation of supervisory authority over questions of monopoly and competition. *See* 49 U.S.C. §§ 1302, 1381. The Communications Act includes no such explicit competitive

monopoly. *See, e. g.,* S.Rep.No.781, 73d Cong.2d Sess. 2 (1934). To require explicit competitive standards, according to one author, "would have the anomalous result of displacing the antitrust laws in industries where Congress felt the competitive ideal was still very important and retaining their applicability in industries where Congress felt competition should not play a significant role." Note, *AT&T and the Antitrust Laws: A Strict Test for Implied Immunity, supra.* Although the failure of Congress explicitly to bestow upon the FCC the duty of preserving competition where beneficial to the public may not justify an inference that Congress intended both acts to operate simultaneously, the absence of standards certainly weakens the analogy to those cases in which the Court found such criteria significant.

**12.** In *NASD,* the Court noted that "the broad regulatory authority conferred upon the SEC by the Maloney and Investment Company Acts enables it to monitor the activities . . . and the history of Commission regulations suggests no laxity in the exercise of this authority." *Id.* at 734, 95 S.Ct. at 2450. The Court was referring, in part, to the SEC's control over NASD rules, a control which, as discussed above, must be exercised before the rules become effective, and which is guided by criteria that explicitly include competition.

As to the challenged ancillary activities intended to frustrate the secondary market in mutual fund shares, the Court noted also that "to the extent [these] activities [might] frustrate the SEC's regulatory objectives it has ample authority to eliminate them." *Id.* This

statement could be interpreted as a rule of implied immunity based on the regulatory agency's power to prevent or halt antitrust violations. And *NASD* has been interpreted by some as following, if not explicitly articulating, a rule that recognizes an immunity whenever an agency has jurisdiction over the activity and the authority to correct the problem. *See, e. g.,* Sherman, *The Application of the Antitrust Laws to Regulated Industries,* 44 Tenn.L.Rev. 1, 25 (1976); *The Supreme Court 1974 Term,* 89 Harv.L.Rev. 47, 211 (1975).

However, the Court's recognition of immunity for the ancillary activities was based primarily on the already established exclusive authority of the SEC under § 22(f) of the Investment Company Act to regulate vertical restraints imposed by the funds themselves. The Court saw an antitrust injunction against activity by NASD members to suppress intrafund secondary market activities as potentially contrary to the SEC's policy of restricting the secondary market. This "close relationship" between the goals of the ancillary activity and the aims of the SEC was "fatal to the Government's complaint." 422 U.S. at 733, 95 S.Ct. 2427. Accordingly, the Court noted that "the Government does not contend that appellee's activities have had the purpose or effect of restraining competition among the various funds." *Id.* 95 S.Ct. at 2449. Had the Government alleged a conspiracy restricting interfund competition, the result might have been different, although the regulatory levers would have been the same. *See id.* at 734 n. 46, 95 S.Ct. 2426.

criteria. Furthermore, the challenged conduct involved the division of routes, a matter at the heart of the CAB authority; no route was permitted without the granting of a certificate by the authority. § 1401. The suit also included a challenge to the close relationship between Pan Am and another common carrier. The statute normally required prior study and approval by the CAB before that type of relationship could be established. § 1408.

In *Hughes Tool Co. v. Trans World Airlines, Inc., supra,* the Court again considered the question of antitrust immunity for CAB regulated activities. Trans World Airlines ("TWA") sued the Hughes Tool Company ("Toolco") for injuries allegedly incurred as a result of Toolco's control of TWA's acquisition and financing of aircraft. Again, the Court attributed substantial significance to the statutory criteria referring specifically to competition and monopoly power. *Id.* 409 at 385, 93 S.Ct. 647. Of particular importance here, the Court's finding of immunity was based on § 408 of the Federal Aviation Act, which required *prior approval* by the CAB of Toolco's acquisition of TWA, and under which the CAB had continued to exercise prior review of subsequent conduct.[13]

The *Pan Am* and *Hughes* decisions, as well as the Supreme Court's discussion of pervasive regulation in *NASD,* make clear that the statutory framework found significant in those cases has no counterpart in the Communications Act of 1934 that would justify an inference of immunity. There is no explicit congressional mandate that the FCC consider competition. More importantly, the Act permits tariffs to become effective without the exercise of agency judgment as to their lawfulness, and requires that they become effective if the FCC has not reached a decision within five months. Thus policy judgments need not precede the possibly anti-competitive conduct. The supervisory role for the FCC established in the Communications Act would thus appear to be too general and potentially passive to support an implied immunity for the challenged conduct of the defendants.[14]

Having decided that the statutory framework does not require an inference of immunity, the question becomes whether the particular regulatory activity of the FCC during the period between the *Carterfone* decision and the promulgation of the registration program for interconnect equipment should change the result. In *Carterfone,* the Commission merely ruled the earlier tariffs unlawful. The FCC neither ordered nor approved the specific replacement tariffs. Thus the defendant's analogy to *Hughes* must fail, because in that case the

13. In *Hughes,* the Supreme Court strongly implied that had the challenged conduct not been subject to agency direction or agreement, there would have been no immunity. 409 U.S. at 385–86 n.14, 93 S.Ct. 647, *quoting United States v. Borden,* 308 U.S. 188, 200, 60 S.Ct. 182, 84 L.Ed. 181 (1939).

14. In *Phonetele, Inc. v. American Tel. & Tel. Co.,* 435 F.Supp. 207 (C.D.Cal.1977), the court held that the defendant's conduct pursuant to the post-*Carterfone* tariffs was immune from antitrust scrutiny because, *inter alia,* the sanctions available to the FCC in enforcing the Communications Act were similar to those available to the courts under the antitrust laws. However, the regulatory limitation to actual damages fails to provide the strong deterrent to anticompetitive behavior established by Congress through the treble damage provision of the antitrust laws.

In addition, the available administrative remedies must be examined in the context of the particular actions alleged in the complaint. Although the Communications Act does provide a damage remedy, the range of conduct prohibited is far narrower than that of the antitrust laws. For example, in the present suit the plaintiff alleges both attempt and conspiracy, neither of which is covered by the Act. Cf. *Terminal Warehouse Co. v. Pennsylvania R. Co.,* 297 U.S. 500, 516, 56 S.Ct. 546, 80 L.Ed. 827 (1936).

The right to sue for damages under the antitrust laws in the present case does not necessarily mean that a plaintiff may resort to both the agency damage procedure and the antitrust courts. It may be that the plaintiff must choose between the two avenues. *See Carnation Co. v. Pacific Conference, Inc.,* 383 U.S. 213, 224, 86 S.Ct. 781, 15 L.Ed.2d 709 (1966). The plaintiff has not attempted to utilize the FCC damage remedy, thus the right to seek treble damages is clearly available.

Supreme Court found that the challenged activity by Toolco was precisely that type of control approved on numerous occasions by the CAB. Indeed, as discussed earlier, the FCC subsequently ruled the post-*Carterfone* protective device requirement violative of the Communications Act. Thus the challenged conduct was primarily the result of independent business judgment as to how to accommodate available technology with the need to protect the telephone lines and the right of customers to use them. *Cf. Cantor v. Detroit Edison Co.,* 428 U.S. 579, 593–94, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Otter Tail Power Co. v. Federal Power Commission,* 410 U.S. 366, 374, 93 S.Ct. 1022, 35 L.Ed.2d 359 (1973). No policy decision by the FCC will be nullified by application of the antitrust laws to the conduct challenged here.[15] This is particularly true in light of the relief requested. Injunctive relief, if granted, would restrict future FCC decision-making or subject defendants to conflicting standards. Northeastern, however, seeks only monetary damages arising from past, federally regulated activity. Thus, there is no potential for interference with agency decisionmaking.

In sum, neither the regulatory framework of the Communications Act of 1934 nor the particular regulatory efforts by the FCC require an immunity for the challenged conduct; application of the antitrust laws will be neither disruptive nor unnecessary. Therefore, Northeastern may sue the defendants under the antitrust laws for damages resulting from conduct relating to the design of protective telephone interconnection equipment prior to the effective date of the FCC's registration program for interconnect equipment.[16]

## II. THE STATE ACTION LIMITATION OF THE SHERMAN ACT.

### STATE REGULATION

Although the FCC declared its "paramount jurisdiction" over the technical standards for interconnection equipment in 1974, and established a comprehensive registration program in 1975, only the states exercise authority over nontechnical interconnection matters, including rates and charges for interconnection. Defendant SNET is a public utility regulated by the PUCA under the Connecticut Public Service Companies Act, which provides the PUCA with jurisdiction over "equipment . . . used in the conduct of the business of the company." Conn.Gen.Stat. § 16–1 (1977). Under § 16–19(a), SNET must file all proposed rate amendments with the PUCA and the PUCA must hold a public hearing and conduct an investigation.

The criteria to be applied by the PUCA in judging a rate proposal include whether the rates are "unreasonably discriminatory or

---

**15.** In *Essential Communication Systems, Inc. v. American Tel. & Tel. Co.,* 446 F.Supp. 1090 (D.N.J.1978), the district court examined the regulatory history of interconnection and concluded that the post-*Carterfone* tariffs were "sanctioned by the FCC as a means to serve its regulatory responsibilities and administrative needs." *Id.* at 1102. As a result, the court found application of the antitrust laws repugnant to the FCC's action. This Court must respectfully disagree. The FCC explicitly withheld even provisional approval of the tariffs. Also, the FCC would undoubtedly have learned at least as much from the experiences of a more liberal interconnection method adopted by the carriers. Finally, the absence of sufficient technical information concerning interconnection may justify the course taken by the defendants, but that is a question to be considered when examining the antitrust question on the merits under the "Rule of Reason." *See Jacobi v. Bache & Co.,* 520 F.2d 1231 (2d Cir.

1975), *cert. denied,* 423 U.S. 1087, 96 S.Ct. 784, 46 L.Ed.2d 642 (1976). It is not a reason to disclaim jurisdiction.

**16.** Northeastern also challenged a number of other actions by the defendants, including massive advertising intended to cast doubt upon the products and services of the defendants' interconnection competitors, an expensive research and development program, and the announcement of improvements in telephone equipment prior to the establishment of a tariff and before the equipment is in stock. The FCC's efforts to regulate these activities have been far less significant than its efforts in the area of interconnection design, and the statutory framework is no more suggestive of a congressional intent to immunize such conduct. Accordingly, these ancillary activities are not immune from the antitrust laws by virtue of federal regulation.

more or less than just, reasonable and adequate, or that the service furnished by the company is inadequate to or in excess of public necessity and convenience." *Id.* The regulated company has the burden of proving that the proposed rate is just and reasonable. Conn.Gen.Stat. § 16–22 (1977). In addition, when considering alterations in specific rates and services, as well as when examining "the expansion of plant ·and equipment . . ., operations and internal workings . . . and the establishment of the level and structure of rates," the PUCA must find that there is a clear public need for the proposed service and that the company is competent to provide the service efficiently. The PUCA must also consider public safety, economic development, energy conservation and the natural environment. Finally, the PUCA must maintain a balance between the public interest and the company's financial soundness. *See id.*; Conn.Gen.Stat. § 16–19e(a)(1)–(4) (1977). If the proposal fails to meet these standards, the PUCA must "determine and prescribe, as appropriate, an adequate service to be furnished or just and reasonable maximum rates and charges." Conn.Gen.Stat. § 16–19(a) (1977). The PUCA is supposed to reach a final decision within 150 days from the proposed effective date, *Id.* However, if the Authority has not made a decision within the required period, the proposed amendment may become effective if the company provides the Authority with sufficient financial assurances that the revenues collected in excess of the rates eventually approved by the Commission will be repaid. Conn.Gen.Stat. § 16–19(b) (1977).

Operating expenses are subject to a PUCA audit every three years, although an audit need be conducted only every six years if the PUCA determines that a more frequent audit is unnecessary. If those conducting the audit conclude that "the operating procedures or any other internal workings of the affected public service company are inefficient, improvident, unreasonable, negligent or in abuse of discretion," the PUCA has the authority, subject to notice and a hearing, to order "new or altered practices and procedures . . . necessary to promote efficient and adequate service to meet the public convenience and necessity." Conn.Gen.Stat. § 16–8(b) (1977).

After deciding to meet the competitive challenge presented by Northeastern and others as the result of the *Carterfone* decision, SNET in 1976 filed tariffs with the PUCA dealing with the provision of private branch exchange ("PBX") service to its customers.[17] Because of the possible competitive impact of these tariffs, the PUCA delayed the effective date of the new rates and at its own initiative held three public hearings in September. Attorneys for both SNET and Northeastern participated, as did a representative of another competitor in the PBX market, and Connecticut's Consumer Counsel. SNET's competitors objected to one of the two alternative methods of payment—"the customized payment plan"—[18] in part because it allegedly established rates so low that cross-subsidization with revenues from other utility services was required, and because it discriminated against those not adopting the plan.

In its decision of January 17, 1977,[19] the PUCA found that the new services would

---

**17.** PBX equipment interconnects the various telephone stations on the customer's premises, and also links this internal system to the public telephone lines.

**18.** This plan includes a two-tier payment schedule to allow the customer to pay monthly maintenance costs while meeting the capital costs through payments spread over a period of years. The use of this payment method by regulated telephone utilities is widespread. *Economic Implications and Interrelationships Arising from Policies and Practices Relating to*

*Customer Interconnection,* 61 F.C.C.2d 766, 868 (1976). According to the plaintiff's calculations, this two-tier plan is attractive only if capital payments are extended over at least seven years, during which period the customer will be inaccessible to competitors.

**19.** *Tariff Filing of Southern New England Telephone Company to Provide Dimension 100 and 400 PBX Service,* No. 760719 (Conn.Pub.Util. Control Auth., Jan. 17, 1977), 17 P.U.R. 4th 191 (1977).

contribute revenue to the company. In discussing Northeastern's claim that the customized payment plan was anti-competitive, the PUCA explained that "[i]t is difficult for this authority to visualize any rate structure or pricing level that would not be anticompetitive and at the same time not limit the availability of the product to the customer at a reasonable price." The PUCA then continued with a disclaimer: "It is not the function of this agency to protect competitors from the regulated utility but rather to assure that consumers are provided the best quality service at the lowest possible price." In order to fulfill this function, the Authority explained that it follows a policy of "maximizing contributions from vertical and competitive services thus minimizing the revenue requirements for basic exchange service." Because the proposed tariffs were found consistent with this policy, they received the agency's approval.

On March 11, 1977 SNET filed another tariff request, this time dealing with a different type of business terminal equipment-key telephone systems ("KTS").[20] Because of the competitive impact of these services on the key system market, the PUCA again at its own initiative suspended the proposed effective date of the tariffs and scheduled a public hearing for April 18, 1977. The proposed tariffs included a "customized payment plan" virtually identical to the PBX payment plan approved earlier. SNET's competitors objected to the payment plan proposed by the defendant because, in part, the plan discriminated against most rate payers by insulating customized plan subscribers from future rate increases. On September 30, 1977 the PUCA approved the tariffs in nearly all aspects,[21] finding a "definite market need" for the new KTS systems and predicting that the systems'

new capabilities would "allow SNET the opportunity to better compete in the Key telephone market." The Authority also noted that the products would not require cross-subsidization from other service.

## STATE ACTION

Northeastern challenges a variety of activities by SNET relating to the marketing of business terminal equipment as violative of the Sherman Act. The plaintiff sees the legally protected monopoly power of the utility as providing the defendants with the capacity to underprice the products of the plaintiff and others, while the defendants see these activities as the embodiment of state telecommunications policy inconsistent with, and not subject to, federal antitrust doctrine. Primarily, Northeastern alleges that the defendants violated the Sherman Act in the pricing of terminal equipment, including both the amount and methods of payment. As a result of these activities, Northeastern argues, the defendants have been able to maintain over ninety-five percent of the business telephone terminal equipment market[22] since the *Carterfone* decision of the FCC.

In *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), the Supreme Court considered the applicability of the Sherman Act to conduct of a public utility pursuant to a tariff approved by the state regulatory body. A state-regulated electric company ran a light-bulb exchange program for its customers, much to the dismay of the plaintiff-retailer. The bulbs were distributed "free," and the costs were recouped through the rate structure. Because the program was included in the approved tariff, the utility was required to operate the program until a new tariff not including the program was approved. In holding that the Sherman Act applied, the Court focused upon two general issues:

**20.** KTS equipment usually consists of a telephone with various buttons allowing the customer to connect to numerous public lines or other internal lines.

**21.** *Application of the Southern New England Telephone Company for Approval of a Tariff to Provide Two New Service Offerings, Con Key 416 and Con Key 2152, and to Classify as*

*Obsolete Con Key 1434 and Certain Con Key 718 Rates and Equipment,* No. 770321 (Conn. Pub.Util.Control Auth., Sept. 30, 1977).

**22.** The market has been defined by the plaintiff to include only PBX and KTS telephone equipment.

first, whether it would be unfair to impose two conflicting legal standards upon the defendant utility, and, second, whether application of federal antitrust principles to the defendant's state-regulated conduct would make the state regulatory program unworkable. *Id.* at 592, 96 S.Ct. 3110 (plurality opinion); *id.* at 603, 96 S.Ct. 3110 (Burger, C.J., concurring).

In discussing the fairness issue, the Supreme Court phrased the inquiry as whether "the private party exercised sufficient freedom of choice to enable the Court to conclude that he should be held responsible for the consequences of his decision." *Id.* at 593, 96 S.Ct. at 3119. The respondent utility in *Cantor*, as just explained, operated the light bulb program with the approval of the state regulators, and could not abandon the program without such permission. The initiative to conduct the program, however, came from the utility. As a result, the Court saw "nothing unjust in the conclusion that the respondent's participation in the decision is sufficiently significant to require that its conduct implementing the decision, like comparable conduct by unregulated businesses, conform to applicable federal law." *Id.* at 594, 96 S.Ct. at 3119. *Cf. Otter Tail Power Co. v. United States, supra* 410 U.S. at 374, 93 S.Ct. 1022. The same conclusion should be reached in the present case. The defendant SNET has initiated the equipment marketing program not at the command of the state, but after exercising its own business judgment regarding the potential profits to be derived from entering the PBX and KTS markets. Therefore, there is no unfairness in subjecting the regulated defendant SNET to the competitive strictures of the antitrust laws.

The more difficult question is whether requiring the defendants to conform to fed-

eral antitrust law will significantly hamper the state's ability to pursue its legitimate regulatory goals. The defendants' argument here is the same as that raised by the *amici curiae* in *Cantor* : that Congress did not intend to apply the antitrust laws to activities regulated by state agencies under a "public interest" standard that is "fundamentally inconsistent" with the antitrust law. 428 U.S. at 595, 96 S.Ct. 3110. The Supreme Court found this argument "unacceptable" as a general matter,[23] and as applied to the facts of that case. The argument must fail in this case as well.

To succeed the defendants must show "that the state has an independent regulatory interest in the subject matter of the antitrust controversy; that there exists a clear and affirmative articulation of the state's policy with regard to that interest; and that the state supervision is active." *Mobilfone of Northeastern Pennsylvania, Inc. v. Commonwealth Telephone Co.,* 571 F.2d 141, 144 (3d Cir. 1978). *See Bates v. State Bar of Arizona,* 433 U.S. 350, 361, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977).

It should first be noted that, unlike the light-bulb exchange program in *Cantor*, the activity challenged in this case, and plaintiff's criticisms of that activity, were the subjects of agency scrutiny. Thus the regulation was "active," and upon approval the PUCA's role was no longer "neutral," a term used by the *Cantor* majority to describe the Michigan Public Service Commission's position on the bulb program. *See Cantor v. Detroit Edison Co.,* 428 U.S. at 585, 96 S.Ct. 3110 (plurality opinion); *id.* at 604–605, 96 S.Ct. 3110 (Burger, C. J., concurring). *See City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 413, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (plurali-

**23.** The Supreme Court plurality wrote as follows:

There are at least three reasons why this argument is unacceptable. First, merely because certain conduct may be subject both to state regulation and to the federal antitrust laws does not necessarily mean that it must satisfy inconsistent standards; second, even assuming inconsistency, we could not accept the view that the federal interest must inevi-

tably be subordinated to the state's; and finally, even if we were to assume that Congress did not intend the antitrust laws to apply to areas of the economy primarily regulated by a State, that assumption would not foreclose the enforcement of the antitrust laws in an essentially unregulated area such as the market for electric light bulbs. 428 U.S. at 595, 96 S.Ct. at 3120.

ty opinion). However, the other two prerequisites to a finding of state action—a "clear and affirmative articulation of the state's policy" and an "independent regulatory interest"—are lacking.

There is no regulatory statute specifically referring to the type of activity challenged, and the statutory framework does not authorize regulation of the terminal equipment *market.* Indeed, in approving the customized payment plan for KTS systems, the PUCA found that the plan would allow SNET to "better compete in the Key telephone market." *Com Key Decision, supra* note 21, at 10. *Contrast Cantor v. Detroit Edison Co., supra* 428 U.S. at 584, 96 S.Ct. 3110, *with Bates v. State Bar of Arizona, supra* 433 U.S. at 362, 97 S.Ct. 2691; and *Mobilfone of Northeastern Pennsylvania, Inc. v. Commonwealth Telephone Co., supra* at 145. The PUCA merely found that the customized payment plan did not violate the Connecticut Public Service Companies Act. There is no indication that an abandonment of the plan would meet with Commission resistance. Thus, it cannot be said that SNET's payment plan was proposed and approved " 'pursuant to state policy to displace competition with regulation or monopoly public service' " in the business telephone equipment market. *City of Lafayette v. Louisiana Power & Light Co., supra,* 435 U.S. at 406, 98 S.Ct. at 1133 (plurality opinion); *id.* at 421–428, 98 S.Ct. at 1141–1144 (Burger, C. J., concurring). *See id.* at 428, 98 S.Ct. 1144 (Marshall, J., concurring).

Finally, the PUCA has no other "independent regulatory interest" that might be frustrated by application of the antitrust laws to the customized payment plan. The Connecticut regulatory scheme, similar to the Michigan scheme in *Cantor,* is not seriously affected by application of the anti-

trust laws to SNET's challenged practices. According to the PUCA decision approving the customized payment plan for PBX equipment, the policy of the PUCA was to maximize "revenue contributions from . . competitive services thus minimizing revenue requirements for basic exchange service." *PBX Filing, supra* note 19, 17 P.U.R. 4th at 195. The PUCA concluded that the rates were high enough to make cross-subsidization unnecessary, thus the payment plans were found consistent with the Authority's revenue policy. At first glance, application of the Sherman Act would seem to conflict with the PUCA's revenue goals in that competition in the business terminal equipment market will tend to keep prices low, and thus minimize the profits available to support basic exchange service for residential customers. If subsidization of basic exchange service is the regulatory goal, however, the PUCA need merely restructure the rates for *service,* increasing the costs to businesses that use PBX equipment (no matter who supplies it) and whose demand for basic service is inelastic *See North Carolina Util. Comm'n v. FCC, supra,* 537 F.2d at 1048. Given the availability of this and other regulatory strategies to redistribute the costs of telephone service, this Court does not consider significant the potential loss of terminal equipment as a source of revenue.

■ Thus, it appears that an immunity from the Sherman Act is not "imperative to the continued effective functioning" of the PUCA as envisioned by the Connecticut legislature. *Cantor v. Detroit Edison Co., supra* 428 U.S. at 597 n. 36, 96 S.Ct. at 3121. Accordingly, SNET's use of the customized payment plan is susceptible to federal antitrust scrutiny.[24] To hold otherwise would

24. The customized payment plan having been found not to be exempt from the Sherman Act, the ancillary activities challenged by Northeastern, *see* note 16 *supra,* are virtually a *fortiori* nonexempt as well. The PUCA's authority is broad, but vague and unexercised. Section 16–6b of the Connecticut Public Service Companies Act empowers the PUCA to adopt regulations dealing with "rates and charges, services, accounting practices, safety and the conduct of

operations generally . . .." The PUCA has not enacted regulations dealing with most of the criticized practices. Although in 1975 the state legislature provided the PUCA with the explicit authority to regulate advertising, Conn.Gen.Stat. § 19d(c), the authority has not yet promulgated regulations. Also, although the PUCA has examined SNET's advertising expenditures, the examination was not conducted with an eye toward the anti-competitive

result in a needless sacrifice of national economic policy. As the *Cantor* court noted, "[t]here is no logical inconsistency between requiring such a firm to meet regulatory criteria insofar as it is exercising its natural monopoly powers and also to comply with antitrust standards to the extent that it engages in business activity in competitive areas of the economy." *Id.* at 596, 96 S.Ct. at 3120.

### III.

■ Northeastern complains that defendants have "carried on public relations campaigns for a moratorium on interconnect competition." It is unclear exactly what the plaintiff means, and the defendants have interpreted this portion of the complaint as attacking the defendants' lobbying efforts for the Consumer Communications Reform Act (S. 530, 95th Cong., 1st Sess.; H.R. 8, 95th Cong., 1st Sess.) which would reestablish the primacy of state regulation over telephone equipment. If the plaintiff's claim is concerned solely with these political efforts, the First Amendment requires dismissal. *See Eastern Railroad Presidents Conference v. Noerr Freight, Inc.*, 365 U.S. 127, 31 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *cf. California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 510–511, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). However, the plaintiff has no duty to specify in the complaint the exact conduct supporting his claims. It is possible that the plaintiff has other activities in mind as well. As a result, dismissal of that portion of the complaint addressed to the defendants' efforts to establish a moratorium on interconnect competition would be premature. *See Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### IV.

■ Defendants argue that the Connecticut Antitrust Act, Conn.Gen.Stat. § 35–24

*et seq.* (1977), is not applicable to the challenged conduct of the defendants. They assert that state law is preempted, at least in the area of federal regulation, by the pervasive regulation of the FCC. Having already concluded that FCC regulation is not so pervasive as to require an immunity from the Sherman Act, this Court considers the preemption argument based upon federal regulation to have lost its force. Defendants also argue that under Connecticut law the state antitrust act does not apply, a position necessarily rooted in the Connecticut Supreme Court decision of *Mazzola v. Southern New England Telephone Co.*, 169 Conn. 344, 363 A.2d 170 (1975).

The Connecticut Public Service Companies Act does not expressly empower the PUCA to exempt activities from the state antitrust laws. In *Mazzola*, the state supreme court held that the Connecticut Public Service Companies Act did not impliedly confer upon the Public Utilities Commission (the predecessor to the PUCA) the authority to exempt from the state antitrust laws conduct by SNET included in an effective tariff. The court's decision was based on the exemption clause of the state antitrust law, which excluded from the act's sweep activity "*specifically* directed or required by a *statute* of the state, or of the United States." Conn.Gen.Stat. § 35–31(b) (emphasis added). This exemption, according to the *Mazzola* court, erected a more stringent standard than the compulsion test of *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975). *Mazzola, supra* 169 Conn. at 366, 363 A.2d 170.

Defendants attempt to distinguish *Mazzola* on the basis of subsequent amendments to the Public Service Companies Act. A number of factors seen as significant by the *Mazzola* court were indeed altered by these amendments. In particular, a regulated utility must now hold a public hearing on any amendment to rates and investigate the amendment to determine whether it con-

impact of such expenditures. *See Application of Southern New England Tel. Co. to Increase It's Rates and Charges for Telephone Service*

*Affecting All Subscribers*, Docket No. 11671 (June 12, 1975).

**266**

forms to the regulatory criteria. However, other factors thought important by the Connecticut court remain. The PUCA has no explicit statutory obligation to consider the possibility anticompetitive effects of a proposed tariff. *See Mazzola supra,* at 368–69, 363 A.2d 170. Rather, the PUCA must focus on efficiency, public safety, the promotion of economic development, conservation of energy, and "prudent management" of the natural environment. Conn.Gen. Stat. § 16–19e. The PUCA must also consider whether the proposed rate amendments are unreasonably discriminatory, unjust, or inadequate to or in excess of the public convenience and necessity. Conn. Gen.Stat. § 16–19. Furthermore, the Connecticut Supreme Court in *Mazzola* made clear that the focus was on the statutory structure, and not on whether the PUCA had actually contemplated the challenged activity when approving the tariff. *Mazzola, supra* at 366, 363 A.2d 170. Finally, as noted above, the Connecticut Supreme Court interpreted the statutory exemption provision as narrower than the *Parker v. Brown* doctrine. And this Court has just interpreted that doctrine, as further articulated in later Supreme Court cases, not to require an antitrust immunity based upon PUCA regulation.

Nevertheless, the *Mazzola* decision is clearly subject to varying interpretations in light of subsequent amendments to the Public Service Companies Act, and the recent Supreme Court decisions may well have shaped the state action doctrine in a manner not anticipated by the Connecticut legislature or by the *Mazzola* court. In addition to the difficulty of the question, the immunity issue raised under state law is deeply embedded in Connecticut's developing regulatory structure. The recently amended Connecticut Public Service Companies Act and the state's new antitrust law have not been interpreted together. Thus a decision by this Court would be merely a "forecast rather than a determination." *Railroad Commission v. Pullman Co.,* 312 U.S. 496, 499, 61 S.Ct. 643, 85 L.Ed. 971 (1941). As the Second Circuit Court of Appeals explained in *Naylor v. Case &*

*McGrath, Inc.,* 585 F.2d 557, at 565 (2d Cir. 1978),

> [a]bstention in favor of state court adjudication is sound judicial administration where, as here, it can increase the assurance that all those affected by the statute in question, including the parties to this action, will be given the benefit of an authoritative and uniform rule of law applied alike to all businesses and grievants.

Abstention from the difficult immunity question in this case will permit the "even development of State law." *Id.* at 565. Accordingly, the claims under the Connecticut Antitrust Act must be dismissed without prejudice to a subsequent filing in the state courts.

The defendants' motions to dismiss are hereby granted as to the state antitrust claim, and denied in all other aspects.